LCW

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

# FILED

**NOV 14 2016** ᏰᏤ

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**



| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and ARTHUR H. BUNTE, JR., as Trustee | ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) ) |
| PIPELINE ENERGY GROUP, INC. d/b/a CARL SMITH PIPELINE, a West Virginia Corporation, | ) ) ) ) ) |
| *Defendant.* | ) ) |

Case No. 14-cv-7258

Judge Thomas M. Durkin

Magistrate Judge Sidney I. Schenkier

## RESPONSE IN OPPOSITION TO THE MOTION FOR RULE TO SHOW CAUSE WHY LEIF A. TORKELSEN SHOULD NOT BE HELD IN CONTEMPT

NOW COME Leif Torkelsen respectfully requests that this Court not grant the Plaintiffs' Motion for Rule to Show Cause why Leif A. Torkelsen should not be held in contempt of this Court, and should not be held liable for the amounts at issue. In support of this Response to the Motion, Leif A. Torkelsen states as follows:

## FACTS

### I.    Judgment and Service of the Citation

1.      On September 15th, 2015, this Court entered a consent judgment for Central States, Southeast and Southwest Areas Pension Fund ("the Fund") against Pipeline Energy Group, Inc. ("PEG") in the amount of $497,863.31. (Dkt. No. 42, p. 4-5, ¶ B.)

1

2.      On October 19th, 2015, this Court issued a Citation in Supplemental Proceedings to Discover Assets ("Citation"). The Citation prohibited PEG from transferring funds.

3.      On October 22nd, 2015, Leif Torkelsen took receipt of this Court's Citation in Supplemental Proceedings to Discover Assets at Pipeline Energy Group's offices in Franklin, TN. As he was no longer an officer of the company, Mr. Torkelsen did not open the Citation, but immediately informed PEG's CEO and controlling shareholder, Beth Ann Smith, of its arrival.

**II.     The KPG Investment**

4.      Beginning in the summer of 2015, Beth Ann Smith and Monte Pratt commenced a scheme to defraud Leif Torkelsen and the creditors of Pipeline Energy Group, Inc. They were joined in this conspiracy by Aubrey Harper of Pipe Line Holdings, part of Energy Capital Partners, a large private equity firm based in Short Hills, New Jersey. Mr. Harper first met Beth Ann Smith and Monte Pratt in late June, 2015. At first, Mr. Harper worked openly with all of Pipeline Energy Group's officers to effect a recapitalization of the company. However, sometime in late August or early September, Beth Ann Smith, Monte Pratt and Aubrey Harper decided to take over Pipeline Energy Group for themselves, using an investment vehicle called KPG, Inc. ("KPG") of 3600 NW 138, Suite 102, Oklahoma City, OK. Accordingly, Beth Ann Smith, Monte Pratt and Aubrey Harper sought to conceal their scheme from the company's only other shareholder (Leif Torkelsen) and its creditors. To this end, they falsely informed Leif Torkelsen that no investment would be forthcoming (Exhibit I).

5.      Under the terms of their agreement, Beth Ann Smith and Monte Pratt would take control of Pipeline Energy Group by informing all shareholders and creditors that the company was

insolvent. Using this false pretense, they would then purchase Leif Torkelsen's 25% interest in Pipeline Energy Group for a nominal sum, and Pipeline's creditors would be encouraged to settle their claims for pennies on the dollar. Meanwhile, Aubrey Harper had already committed to an investment of several million dollars in the company to be completed as soon as Mr. Torkelsen was totally removed from the company. The Letter of Intent between KPG and PEG (Exhibit II) was signed only a few days after Mr. Torkelsen was induced to sign the Term Sheet to Confidential Termination Agreement and Share Repurchase Agreement (Exhibit III) ("Termination Agreement").

6.      Beginning in the late summer of 2015, Beth Ann Smith and Monte Pratt took *de facto* control of the company. In furtherance of their scheme, Leif Torkelsen was denied any substantive ability to conduct business on behalf of Pipeline Energy Group, Inc. During the week of July 16th, 2015, Beth Ann Smith approached one of Pipeline Energy Group's outside accountants, Dan Krauss of Spielman, Koenigsberg & Parker to become the new CFO.  On September 18th, 2015 Beth Ann Smith forwarded Dan Krauss' resume to Aubrey Harper for his approval (Exhibit IV). Then, on September 23rd, 2015, Beth Ann Smith forwarded Pipeline Energy Group's new management structure to Aubrey Harper (Exhibit V) ("Organizational Chart"). It clearly showed that Leif Torkelsen was no longer an officer of the company, and that he would be replaced by Dan Krauss pending Aubrey Harper's approval.

7.      From this point forward, Leif Torkelsen was left with no material role in the company. However, as Beth Ann Smith, Monte Pratt and Aubrey Harper hoped to defraud Leif Torkelsen of his shares, they declined to inform him of the recent management changes. They simply

bypassed or ignored Leif Torkelsen on all further company business. Notably, Beth Ann Smith refused Leif Torkelsen's persistent entreaties to honor the agreement with Central States.

### III.     The post-Citation Transfers

8.     Even though the Citation was served on PEG on October 22nd, 2015, and expressly prohibited PEG from transferring funds, Beth Ann Smith and Monte Pratt continued to allow PEG to transfer monies – including to Mr. Pratt himself and to a business owned by Mr. Torkelsen – after October 22nd, 2015. These post-Citation transfers can be broken down into three groups: (A) $79,441.92 in transfers in relation to PEG's final construction project; (B) $64,000.00 in transfers to Monte Pratt; and (C) a $40,000.00 transfer to a company owned in full by Leif Torkelsen (collectively, the "Transfers").

### A.     The $79,441.92 in Transfers for the Project

9.     At the time PEG was served with the Citations, PEG was only performing one construction project (the "Project") for Eureka-Hunter Pipeline, LLC ("Eureka-Hunter"). Earlier in 2015, as part of PEG's standard operation procedure, the Project's superintendent, David Riffle, was given authority to sign checks for limited purposes, subject to the approval of Beth Ann Smith and the Monte Pratt, in his capacity as the Vice-President in charge of construction. Leif Torkelsen had no supervisory authority over Mr. Riffle, and was unaware of most, if not all, of these transactions.

10.     As part of their scheme to close the KPG Investment, Beth Ann Smith and Monte Pratt placed great importance on obtaining further work from Eureka-Hunter, Pipeline Energy Group's sole remaining customer. Accordingly, Beth Ann Smith and Monte Pratt went to great lengths to

4

continue paying field personnel and critical vendors. This was done in spite of Pipeline Energy Group's other obligations, and without the consent and/or knowledge of Leif Torkelsen.

11.     David Riffle, the project superintendent, reported only to Beth Ann Smith and Monte Pratt. Leif Torkelsen had no administrative control over Mr. Rifkin. Riffle had previously worked for Monte Pratt at other companies. All checks written by Mr. Rifkin were done with the knowledge and consent of Beth Ann Smith and Monte Pratt. These payments were made to maintain good relations with Eureka-Hunter as part of their fraudulent scheme. Beth Ann Smith and Monte Pratt deliberately kept Leif Torkelsen in the dark, preferring to work with the new CFO, Dan Krauss.

**B.      The $64,000.00 in Transfers to Monte Pratt**

12.     On November 18th, 2015, PEG transferred $50,000.00 to Mr. Pratt. Two additional payments of $7,000 each were made on January 8th and January 12th, 2016. Leif Torkelsen had no role in these payments, as he had long since been constructively removed from Pipeline Energy Group.

13.     On November 17th, 2015, Monte Pratt had instructed Keith Akers of BlueCore Technologies to terminate all electronic access for Leif Torkelsen at Pipeline Energy Group (Exhibit VI). Even the password on Mr. Torkelsen's desktop was changed without his knowledge. Furthermore, Beth Ann Smith and Monte Pratt went to the local BB&T bank branch in Cool Springs to transfer all Pipeline Energy Group funds to new accounts controlled by them. Mr. Torkelsen attempted to object to these transfers, but gave up after he was informed that he had no right to do so by counsel (Exhibit VII).

5

14.     On November 18th, 2015, Mr. Torkelsen signed the Termination Agreement acknowledging that he no longer had any interest or involvement in Pipeline Energy Group whatsoever. Accordingly, Leif Torkelsen had no role in the decisions to pay any monies to Monte Pratt. Beth Ann Smith's assertion to the contrary is false.

**C.      The $40,000.00 in Transfers to Leif Torkelsen's Company, Dragoon Capital**

15.     Leif Torkelsen's father, John Torkelsen, worked for PEG as an independent contractor. PEG did not pay John Torkelsen directly, but paid him through Dragoon Capital, LLC. Dragoon Capital was controlled by Leif Torkelsen.

16.     On November 16th, 2015, Beth Ann Smith fired John Torkelsen. The following day, November 17th, 2015, Monte Pratt had Keith Akers of BlueCore Technologies remove all electronic access for John and Leif Torkelsen. Beth Ann Smith and Monte Pratt then went to the BB&T branch in Cool Springs to transfer all PEG funds to new accounts.

17.     In order to complete their scheme to seize control of PEG, Beth Ann Smith and Monte Pratt wished to make a final legal settlement by which Mr. Torkelsen would relinquish all rights to his ownership in Pipeline Energy Group. At the behest of Beth Ann Smith and Monte Pratt, Pipeline Energy Group's lawyer, Richard Smith of Wiley Rein, prepared the Termination Agreement. Unable to afford an attorney of his own, Leif Torkelsen relied on Richard Smith to advise him on the legal merits of the transaction. Richard Smith strongly advised Leif Torkelsen to sign the agreement. Relying on the advice of corporate counsel, Leif Torkelsen signed the Termination Agreement on November 18th, 2015.

18.    On November 23rd, 2015, PEG wired $40,000.00 to Dragoon Capital. Of these funds,

approximately $12,000.00 went to pay John Torkelsen's hotel bill in Franklin, TN, where he had

been living for the previous three months. Leif Torkelsen then paid $18,000.00 to John

Torkelsen, and the remaining $10,000.00 to himself.

## **ARGUMENT**

### I.    **Leif Torkelsen Was No Longer an Officer of the Corporation at the Time of the Transfers**

19.    Leif Torkelsen does not meet the definition of a corporate officer under the applicable

law, and so could not have exerted any control over the Transfers. Under Illinois law, "All

officers and agents of the corporation, as between themselves and the corporation, shall have

such express authority and perform such duties in the management of the property and affairs of

the corporation as may be provided in the by-laws, or as may be determined by resolution of the

board of directors not inconsistent with the by-laws and such implied authority as recognized by

the common law from time to time." (805 ILCS 5/8.50). By September of 2015, Leif Torkelsen

had no meaningful authority other than as an agent of the corporation in extremely limited

circumstances as dictated by Beth Ann Smith. Indeed, Beth Ann Smith's own Organizational

Chart showed that Leif Torkelsen was no longer an officer of the company as of September 23rd,

2015.

20.    Although Leif Torkelsen was not informed of Beth Ann Smith's action, as she wished to

conceal the KPG Investment from him, he was constructively removed from his position as an

officer of PEG. Monte Pratt, however, was informed of Beth Ann Smith's action at the time that

7

it occurred. Accordingly, Leif Torkelsen had none of the powers associated with an officer of PEG.

21.     PEG was a West Virginia corporation, and §31D-8-843(b) of the West Virginia Code holds that "A board of directors may remove any officer at any time with or without cause". As the President, CEO, director and controlling shareholder of Pipeline Energy Group, Beth Ann Smith was able to remove Leif Torkelsen at her discretion. Beth Ann Smith's actions make it clear that Leif Torkelsen was constructively stripped of his status as a corporate officer as of September 23rd. 2015.

## II.     Defendants Beth Ann Smith and Monte Pratt Concealed Transfers from Leif Torkelsen

22.     As part of their scheme to acquire Leif Torkelsen's ownership position in Pipeline Energy Group prior to Aubrey Harper's investment, Beth Ann Smith and Monte Pratt concealed much of their activity. The conspirators sought to give Leif Torkelsen the impression that Pipeline Energy Group would cease operations so that they could acquire his stock for a nominal price. Towards that end, Leif Torkelsen was effectively removed from any management decisions by September of 2015. Accordingly, numerous meetings, correspondence, contracts and money transfers were not disclosed to Leif Torkelsen.

23.     Under Illinois law, "[I]n order to avoid liability for permitting mismanagement, it is incumbent upon a corporate director, on learning facts sufficient to put a prudent man on guard, to take the appropriate action under the circumstances." *In re Illinois Valley Acceptance Corp.*, 531 F. Supp. 737 (C.D.ILL. 1982). In this instance, due to the efforts by Beth Ann Smith and Monte Pratt to hide their scheme, Leif Torkelsen had no knowledge of most of the relevant

money transfers. Absent that knowledge, due to a concerted effort to conceal these transfers from him, Leif Torkelsen violated no fiduciary duty to prevent them. Moreover, Beth Ann Smith's self-dealing was prejudicial to Leif Torkelsen's own interests, and there is no reason to believe that he would have sanctioned her actions had they been fully known to him.

### III.     Leif Torkelsen Consulted Corporate Counsel Before Accepting the Transfer to Dragoon Capital

23.     In the matter of the transfer of the $40,000 to Dragoon Capital, Leif Torkelsen is not liable as he was no longer an officer of the corporation. Moreover, he is covered by the advice-of-counsel defense, in that he relied on the assurance of Richard Smith, Pipeline Energy Group's long-time corporate counsel, as to the propriety of the payment made to Dragoon Capital. Leif Torkelsen had worked with Richard Smith for years, and had no reason to distrust his legal advice or ethics. Accordingly, Leif Torkelsen was justified in relying on Richard Smith's legal opinion, in a manner consistent with the prudent man rule.

**WHEREFORE**, Leif Torkelsen respectfully requests that this Court not grant the Plaintiff's Motion for Rule to Show Cause and not hold Leif Torkelsen in contempt, and not liable for the amount of the Transfers.

Dated: November 9, 2016                    Respectfully Submitted,

                                           Leif A. Torkelsen
                                           3908 Valley Road
                                           Nashville, Tennessee 37205
                                           Telephone: 614-769-1538
                                           Leif.tork@gmail.com
                                           APPEARING *PRO SE*

## CERTIFICATE OF SERVICE

I, Leif A. Torkelsen, attorney *pro se*, certify that on November 9, 2016, I caused the foregoing

Motion in Opposition for Rule to Show Cause to be served on all parties via UPS overnight mail.


Andrew J. Hernik
Central States Law Department
9777 W. Higgins Road
Rosemont, Illinois 60018


 

Leif A. Torkelsen
3908 Valley Road
Nashville, Tennessee 37205
Telephone: 614-769-1538
Leif.tork@gmail.com


November 9, 2016                                       APPEARING *PRO SE*

# EXHIBIT I

## Fwd: Progress

Aubrey Harper [aubrey.harper@outlook.com]
**Sent:** Wednesday, November 04, 2015 4:54 AM
**To:** Beth Ann Smith

I will not respond to this per our conversation yesterday. We can discuss tonight.

Aubrey Harper
iPhone

Begin forwarded message:

**From:** Aubrey Harper <aubrey.harper@outlook.com>
**Date:** November 4, 2015 at 4:53:25 AM CST
**To:** <aubrey.harper@outlook.com>
**Subject: Fwd: Progress**

Aubrey Harper
iPhone

Begin forwarded message:

**From:** "John B. Torkelsen" <john@carlsmithpipeline.com>
**Date:** November 3, 2015 at 6:10:38 PM CST
**To:** Aubrey Harper <aubrey.harper@outlook.com>
**Cc:** Beth Ann Smith <bethann@carlsmithpipeline.com>, "Monte C. Pratt" <monte@carlsmithpipeline.com>, "Leif
A. Torkelsen" <leif@carlsmithpipeline.com>
**Subject: Progress**

Aubrey

Beth Ann has been keeping the four of us informed of your progress with Energy Capital Partners.

And we all hope that a successful conclusion will be reached very soon.

However, it is important that we all speak. While finally resolved, the process with MarkWest has taken too long – and our cash flow is hurting. We would like to see if, in some creative way, we could obtain a modest amount of interim "bridge" funding through your relationship with Energy Capital Partners.

We can all get on a call together to talk about it.

Please let me know.

Thank You Very Much

**John**

**Carl Smith Pipeline**
5000 Meridian Blvd., Suite 750
Franklin, Tennessee 37067
phone: 615-764-0000
fax: 615-764-0025
web: www.carlsmithpipeline.com
follow us on twitter: @SmithPipeline

# EXHIBIT II

## LETTER OF INTENT

**THIS LETTER OF INTENT** (the "Letter") made as of this 23rd day of November, 2015 (the "Execution Date"),

**BETWEEN:**

KPG Inc. of 3600 NW 138 Suite 102, Oklahoma Dity, Oklahoma 73134

("Purchaser")

- AND -

Pipeline Energy Group, Inc of 5600 Meridian Suite 750, Franklin, Tennessee 37067

("Seller").

**BACKGROUND:**

A. The Seller is the owner of a business that is requesting the investment and purchase of stock.

B. The Purchaser wishes to invest and purchase the stock from the Seller.

This Letter will establish the basic terms to be used in a future business purchase agreement between the Seller and the Purchaser. The terms contained in this Letter are not comprehensive and it is expected that additional terms may be added, and existing terms may be changed or deleted. The basic terms are as follows:

**Non-Binding**

1. This Letter does not create a binding agreement between the Purchaser and the Seller and will not be enforceable. Only the future business purchase agreement, duly executed by the Seller and the Purchaser, will be enforceable. The terms and conditions of any future business purchase agreement will supersede any terms and conditions contained in this

Letter. The Seller and the Purchaser are not prevented from entering into negotiations with other third parties with regard to the subject matter of this Letter.

### Transaction Description

2. The business (the "Business") that is the subject of this Letter is located at:
   Pipeline Energy Group, Inc.
   5000 Meridian Blvd. Suite 750
   Franklin, TN 37067.

3. The Business is described as:
   Pipeline Construction.

### Purchase Price

4. The Purchaser will pay to the Seller the amount of $4,000,000.00 USD on or before the 8th day of January, 2016 (the "Closing Date") as payment in full for the Business.

### Representations

1. The Seller and Purchaser understand this transaction is contingent on review of the following:

   1. Under the terms of this financial agreement both parties agree to maintain full confidentiality. If the document is shared with an outside entity that party (by its receipt of document) agrees to the full and complete confidentiality
   2. Review and acceptance of current financial reports
      a. Purchaser has completed a preliminary review of the financial reports and understands the financial condition of the Seller
   3. Acceptance of Corporate structure
   4. Acceptance of Corporate Officer Employment Contracts
   5. Amount of stock to be purchased
   6. Acceptance of pending accounts payable and accounts receivable
   7. Review and acceptance of pending contracts
   8. Final acceptance of a Due Diligences

This Letter accurately reflects the understanding between the Seller and the Purchaser, signed on this 23rd day of November, 2015.

Per: _Aubry D. Harper_  11-23-2015

Aubrey D. Harper
Chief Executive Officer
KPG Inc. (Purchaser)


Per: _____

Beth Ann Smith
Chief Executive Officer
Pipeline Energy Group, Inc (Seller)

# EXHIBIT III

# TERM SHEET
## TO
### CONFIDENTIAL TERMINATION AGREEMENT
### AND
### SHARE PURCHASE AGREEMENT

**1. Parties:**  Pipeline Energy Group, Inc. d/b/a Carl Smith Pipeline ("Pipeline")
      Beth Ann Smith
      Leif A. Torkelsen
      John B. Torkelsen
      Dragoon Capital ("Dragoon")

**2. Consideration:** Pipeline shall pay total consideration of $70,000.00 to Dragoon in two separate installments: (1) $40,000.00 to be paid by wire immediately upon execution of this Term Sheet; (2) $30,000.00 to be paid in escrow to Wiley Rein LLP, as escrow agent, upon execution of the Confidential Termination Agreement, which shall be released to Dragoon upon the return of all Pipeline Property, as discussed in Section 7 hereof.

Immediately upon Dragoon's receipt of the $40,000 wire payment, Leif Torkelsen shall resign from all positions at Pipeline, including but not limited to Executive Vice President, Director, and Chief Financial Officer, and shall not hold himself out to anyone as being an officer or director of, or employed by, Pipeline. Immediately upon Dragoon's receipt of the $30,000 payment, Leif Torkelsen shall execute the Share Purchase Agreement.

Beth Ann Smith shall pay $10.00 to Leif Torkelsen in exchange for his execution of a Share Purchase Agreement relinquishing and assigning any and all ownership interest in Pipeline or any related entity.

**3. General Release:** All parties mutually release each other from any and all known or unknown claims (past, present or future) arising from or related to this Term Sheet, the Confidential Termination Agreement, the Share Purchase Agreement, or services provided by any party to another party.

**4. Cooperation:** Leif Torkelsen and John Torkelsen shall cooperate with Pipeline, and its representatives, to respond to requests about Pipeline matters for which they may have information or first-hand knowledge, and in connection with any litigation, investigation or other matter arising out of or related to their association with Pipeline, including but not limited to finalizing and executing of any written agreements or documents that may be required, such as the Confidential Termination Agreement, the Share Purchase Agreement, and the retraction of the BB&T Letter discussed in Section 9 hereof.

**5. Indemnification:** Pipeline agrees to indemnify Leif Torkelsen and John Torkelsen from and against all claims related to or arising from services provided to Pipeline.

1

**6. Confidentiality:** The terms and conditions of this Term Sheet and the forthcoming Confidential Termination Agreement and Share Purchase Agreement shall remain confidential.

**7. Failure to Comply:** Leif Torkelsen and John Torkelsen shall strictly comply with the obligations set forth in this Term Sheet. If they do not, Dragoon shall return to Pipeline any and all payments received under this Term Sheet.

**8. Return of Property:** Leif Torkelsen and John Torkelsen shall return to Pipeline within fifteen (15) business days of the execution of this Term Sheet all Pipeline property within their possession, including but not limited to all computer servers, data and software (the "Pipeline Property").

All shipping or other costs incurred in returning the Pipeline Property shall be born in full by John Torkelsen and Leif Torkelsen.

**9. Retraction of Letter:** Leif Torkelsen shall, immediately upon execution of this Term Sheet, retract or cause to be retracted the letter sent to BB&T Bank alleging fraudulent conduct regarding the use of Pipeline's account with BB&T ("the BB&T Letter"). Upon notice from BB&T that the BB&T Letter has been retracted and the freeze on Pipeline's BB&T bank account has been permanently lifted, Leif Torkelsen shall immediately provide notice of the same to Pipeline.

**10. Non-Disparagement:** Each party shall not, directly or indirectly, make any statement disparaging or tending to disparage any other party hereto.

**11. No Conflict of Interest:** Each of the undersigned hereby represent and agree that they have asked Wiley Rein LLP to assist in negotiating their agreement and to draft any and all documents necessary to memorialize it, including, but not limited to, this Term Sheet. The undersigned understand and acknowledge that Wiley Rein LLP is currently counsel to Pipeline Energy Group, Inc. and that no client relationship is intended or created between the firm and any other individual or entity by virtue of that representation or Wiley Rein's involvement in this agreement. By signing this Term Sheet, each of the undersigned hereby waive any conflict with regard to Wiley Rein, and each of them agrees that he or she will not use Wiley Rein's involvement here as a basis to disqualify Wiley Rein from its representation of Pipeline Energy Group, Inc., now or in the future, including in any representation adverse to any of them. The waivers and representations set forth herein apply with equal force to Wiley Rein's service as an escrow agent, as contemplated herein; and with regard to that service, in addition to the waivers and representations set forth herein, each of the undersigned hereby release Wiley Rein LLP and its individual attorneys from any and all claims it may have against any of them, now or in the future.

It is understood that Wiley Rein does not provide advice as to whether the undersigned should consent to the terms herein, or should provide the waivers and releases set forth herein with respect to the Firm. By signing below, the undersigned each acknowledge that they have had the opportunity to review the matters addressed herein with their own counsel.

2

**12. Counterparts:** This Term Sheet may be executed in any number of original counterparts. Any such counterpart, when executed shall constitute an original of this Term Sheet, and all such counterparts together shall constitute one and the same agreement.

This Term Sheet is executed as of November 18, 2015.

Beth Ann Smith
In her personal capacity, and
In her capacity as CEO and Director of Pipeline

Leif A. Torkelsen
In his personal capacity, and
In his capacity as Managing Director of Dragoon

John B. Torkelsen

3

# EXHIBIT IV

# Resume

Beth Ann Smith

**Sent:** Friday, September 18, 2015 7:41 AM
**To:** Aubrey Harper [aubrey.harper@outlook.com]
**Attachments:** Dk_Resume.pdf (86 KB)

As we discussed.

**Beth Ann Smith**
President

**Carl Smith Pipeline**
5000 Meridian Blvd., Suite 750
Franklin, Tennessee 37067
phone: 615-764-0000
fax: 615-764-0025
web: www.carlsmithpipeline.com
follow us on twitter: @SmithPipeline

# EXHIBIT V

## Annual Corporate Salary Structure

| Title | Name | Salary |
|---|---|---|
| President | Beth Ann Smith | $375,000.00 |
| Vice Pesident | Monte Pratt | $330,000.00 |
| CFO | To Be Named | $325,000.00 |
| Accoutning Manager | Blanche Harrison | $85,000.00 |
| Payroll Manager | Barbara Cook | $65,000.00 |
| Accounts Payable Clerk | Melanie Laursen | $52,000.00 |
| Safety/Invoicing | Jessica Lehman | $65,000.00 |
| Estimator | Chandler Scheitlin | $39,000.00 |
| Equipment Supervisor | Gina Singleton | $44,200.00 |

* Current salary structure restructuring will be required

# EXHIBIT VI

**Cc:** John B. Torkelsen <john@carlsmithpipeline.com>
**Subject:** Fwd: changes at Carl Smith Pipeline

Hi Leif,

Can you handle this please?
Or let me know what you want me to do?

thanks
Kel

-------- Original Message --------
**Subject:** changes at Carl Smith Pipeline
   **Date:** Tue, 17 Nov 2015 18:14:21 +0000
   **From:** Keith Akers <KAkers@bluecoretech.com>
      **To:** kelter@badcat.com <kelter@badcat.com>
      **CC:** monte@carlsmithpipeline.com <monte@carlsmithpipeline.com>

Kel, there have been some changes at Carl Smith Pipeline this week and we need to see if you can
change some passwords. The remaining cast at CSP is as follows:
-   Beth Ann Smith
-   Monte Pratt
-   Tenisha Redman
-   Jessica Lehman
-   Blanche Harrison
-   Barbara Cook
-   Dan Krauss

Are you able to reset all the other users' passwords?

 **BlueCore**

Keith Akers | Technical Manager | 133 Holiday Court Suite 201 Franklin, TN 37067 | Support: 615.807.1266

CONFIDENTIALITY NOTE: This e-mail and any attachments may contain confidential information. If you are not the intended
recipient, be aware that any disclosure, copying, distribution or use of confidential information is prohibited. If you have received
this e-mail in error, please notify the sender immediately by returning the e-mail to the sender and delete this copy from your
system. Thank you for your cooperation.

# EXHIBIT VII



**Pipeline Energy Group, Inc.**
**5000 Meridian Blvd., Suite 750**
**Franklin, Tennessee 37067**

November 17, 2015

BB&T Bank
1175 Meridian Blvd.
Franklin, TN 37067

To Whom It May Concern:

It has come to the attention of the Board of Directors of Pipeline Energy Group, Inc. (d/b/a Carl Smith Pipeline) that certain persons claiming to represent our company have opened additional bank accounts and have wired corporate funds to those accounts without authorization of the Board. These transactions are unauthorized, potentially fraudulent, and must be halted pending further investigation.

This letter is to inform BB&T of possible corporate malfeasance, and asks for the bank's cooperation. I am a member of the Board of Directors. Our attorneys will be in touch with the bank's representatives shortly.

Sincerely,

Leif A. Torkelsen
Director, Executive Vice-President and Chief Financial Officer
Pipeline Energy Group, Inc.

(615) 764-0000
FAX (615) 764-0025